IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MARTIN R. WASCHAK,

   Plaintiff,

     v.

THE ACUITY BRANDS, INC.
SENIOR MANAGEMENT BENEFIT
PLAN,

   Defendant.

CIVIL ACTION FILE
NO. 1:07-CV-3121-TWT

ORDER

This is an action for retirement benefits governed by ERISA. It is before the Court on the Plaintiff's Motion for Summary Judgment [Doc. 22] and the Defendant's Cross Motion for Summary Judgment [Doc. 23]. For the reasons set forth below, the Plaintiff's Motion is GRANTED and the Defendant's Motion is DENIED.

I. Introduction

The Plaintiff is a former vice president of Lithonia Lighting. The Defendant now owns that business. At issue is the Defendant's Senior Management Benefit Plan ("the Plan"), which served as the Defendant's retirement plan for its more highly-compensated employees. The Plan is unfunded, with benefits paid out from the Defendant's general assets. (Pl.'s Mot. for Summ. J., Ex. A, §10.2). The employees

who contribute to the Plan are general unsecured creditors of the Defendant. (Id.) The Plaintiff contributed to the Plan from its inception in 1985 for eight consecutive years. He retired on March 31, 1999, and began collecting his retirement benefits two years later on April 1, 2001. The monthly payments -- which include the Plaintiff's contributions plus interest earned on the contributions -- continue for a total of fifteen years.

The parties now dispute how to calculate the interest component of the Plaintiff's benefit. Generally, the Plan calls for an employee's account to be credited annually with that year's interest earnings. (Pl.'s Mot. for Summ. J., Ex. A, §4.3). The amount of interest is determined by the Plan's "Interest Earnings Rate," which is 3 points higher than the Moody's Interest Rate. Moody's publishes its rates monthly; the interest earned is the twelve-month average of Moody's rates. (Id.) The Plan's provision for benefit payments states that:

> The amount payable for the first year hereunder shall be an amount that will fully amortize the balance in Participant's Deferred Benefit Account, as of the Participant's Benefit Determination Date, over the fifteen (15) year period, based on assumed interest earnings using the Interest Earnings Rate . . . as of said Benefit Determination Date. Thereafter, annually, on the Anniversary Date, the amount payable for the following year shall be adjusted to an amount that will fully amortize the remaining balance in Participant's Deferred Benefit Account, on said date, over the remaining years in the fifteen (15) year installment period, based on the Interest Earnings Rate. . . .

(Pl.'s Mot. for Summ. J., Ex. A, §5.5(a)). That provision is arguably qualified by § 5.4(a) of the Plan, which is titled "Determination of Retirement Benefits." (Pl.'s Mot. for Summ. J., Ex. A, §5.4(a)). That section declares that when an employee retires,

> a benefit shall be payable to such Participant ("Retirement Benefit") equal to the greater of: (i) the total amount of such Participant's Deferred Benefit Account . . . as of his Benefit Determination Date, including interest at the Interest Earnings Rate, through such Benefit Determination Date; or (ii) the amount determined pursuant to Schedule B attached hereto and made a part hereof. . .

(Id.)

The Schedule B referenced in the Plan is titled "Summary of Guaranteed Minimum Annual Retirement Benefits" and lists an annual benefit, the Plaintiff's account balance at retirement, and the total retirement benefit. Schedule B provides that it is a "guaranteed minimum" because it calculates interest at a rate of 11%, regardless of the variable interest earnings rate. For years, this was interpreted by the Defendant to mean that the retiree was entitled to payment with interest of at least 11% for every year.

Now, the Defendant makes a distinction based on the "Benefit Determination Date" in paying retirement benefits. Before that date, which immediately precedes the employee's retirement, the Defendant credits the employee's account with the greater of the two interest rates. In other words, the Defendant guarantees an 11% interest rate on the account while the employee is deferring benefits. After this deferment

period, the employee no longer enjoys a minimum interest rate and the account is credited only by the variable interest earning rate.

When the Plaintiff began contributing to his retirement plan, the interest earnings rate was nearly 14%. Since that time, the rate has (as a general trend) declined. By the time the Plaintiff began collecting his benefits in 2002, the interest earnings rate was 10.46%. The rate dipped under 9% in the Defendant's 2005 fiscal year. In December 2006, the Defendant reinterpreted the Plan to remove the interest floor after the Benefit Determination Date. It notified the Plaintiff and other retirees that its previous "misinterpretation has resulted in overpayments to you in the years where the Schedule B amount [with an interest floor] exceeded the Moody's plus 3 calculation." (Pl.'s Mot. for Summ. J., Ex. HH, at 1). This overpayment exceeded $12,000, but, as a courtesy, the Defendant did "not ask that [the Plaintiff] immediately return the overpayments in a lump sum." (Pl.'s Mot. for Summ. J., Ex. HH, at 2). Since the letter, however, the Defendant has offset the Plaintiff's benefit payments in addition to paying out a lower interest rate for the benefit calculation. The Plaintiff maintains that he is entitled to benefits calculated with a minimum interest rate of 11% and filed this action to recover the higher amount. Both parties now move for summary judgment.

II. Summary Judgment Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

III. Discussion

First, the Court must determine what standard of review to apply to the Plan administrator's most recent benefits determination. The Defendant argues that, because the administrator possessed exclusive discretionary authority, an arbitrary and capricious standard of review is appropriate. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111 (1989). Under Eleventh Circuit precedent, this arbitrary and capricious standard is essentially an abuse of discretion standard. Hunt v. Hawthorne Associates, Inc., 119 F.3d 888, 912 (11th Cir. 1997). Additionally, the Defendant concedes that it has a conflict of interest in administering the Plan itself. "Where the

employer both funds the plan and evaluates the claims," the Supreme Court has recognized that the "fiduciary interest may counsel in favor of granting a borderline claim while its immediate financial interest counsels to the contrary." Metropolitan Life Insurance Co. v. Glenn, 128 S. Ct. 2343, 2348 (2008). Nonetheless, the Supreme Court made clear that a deferential standard of review would still be appropriate and eschewed any "special burden-of-proof rules, or other special procedural or evidentiary rules" where a conflict exists. Id. at 2351. Instead, it is just one factor in a flexible analysis where "any one factor [may] act as a tiebreaker" or, conversely, even shrink down to a "vanishing point." Id. The Eleventh Circuit has noted that under the Glenn standard "the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." Doyle v. Liberty Life Assurance Company of Boston, 542 F.3d 1352, 1360 (11th Cir. 2008). If there is a conflict, the district court must determine whether the conflict tainted the decision, thereby making the decision unreasonable. Id.

Presumably, our Circuit still follows the six-step analysis to review an administrator's decision. This analysis -- modified slightly by Glenn -- directs a district court to: (1) Apply a de novo standard to determine whether the administrator's decision was a correct interpretation; if the decision was correct, the inquiry ends. (2) If the decision is "wrong," then determine whether the administrator

had discretion to determine the claim (if not, the administrator's decision is reversed). (3) If the decision is wrong under the de novo standard, but he possessed discretion to review the claims, determine whether the administrator had reasonable grounds to make the decision under the arbitrary and capricious standard. (4) In the event of no reasonable grounds for the decision, it is reversed; if there are reasonable grounds, then determine whether the administrator operated under a conflict. (5) If there is no conflict, affirm the administrator's decision. (6) If there is a conflict, weigh the conflict using the flexible analysis described by the Glenn and Doyle courts. Doyle, 542 F.3d at 1356.

Relying on this analysis, the Defendant maintains that the inquiry should be swift and end upon this Court's finding that the administrator's decision was correct. (Def.'s Br. in Opp'n to Pl.'s Mot. for Summ. J., at 15) (citing Cathey v. Sweeney, 474 F. Supp. 2d 1333, 1336 (S.D. Ga. 2007)). The Plaintiff, however, argues for another theory that could sidestep the cumbersome review laid out above, and urges that the Defendant be equitably estopped from paying benefits below the 11% interest rate. Equitable estoppel is a "very narrow" remedy only available when a plaintiff shows that: (1) the disputed plan provisions are ambiguous; and (2) the defendant makes oral representations to help interpret the ambiguity. See Katz v. Comprehensive Plan of Group Insurance, Alltel, 197 F.3d 1084, 1090 (11th Cir. 1999); Kane v. Aetna Life

Insurance, 893 F.2d 1283 (11th Cir. 1990).[1]  Beyond the boilerplate, there is a limitation -- typical in estoppel actions -- that an estoppel cannot enlarge or extend the coverage beyond the contract terms.  Kane, 893 F.2d at 1285 n.3.  Thus, unlike garden-variety reviews of benefit denials, equitable estoppel claims do not require a determination of whether an administrator's interpretation was "correct" or "wrong" -- only if the Plan itself was not clear on what the "correct" interpretation is.

The Defendant argues that the only relevant language in the Plan, §5.5 (titled "Payment of Retirement Benefits"), is unambiguous.  The Defendant focuses on this language from §5.5:

> Thereafter, annually, on the Anniversary Date, the amount payable for the following year shall be adjusted to an amount that will fully amortize the remaining balance in Participant's Deferred Benefit Account, on said date, over the remaining years in the fifteen (15) year installment period, based on the Interest Earnings Rate. . . .

(Pl.'s Mot. for Summ. J., Ex. A, §5.5(a)).  Standing alone, that sentence clearly directs payments "based on the Interest Earnings Rate," or without a guaranteed minimum

---

[1]  The Court notes that the Plaintiff did not specifically plead under a theory of equitable estoppel in his Complaint.  This does not prevent him from advancing that argument now.  Katz, 197 F.3d at 1090 (citing Kane, 893 F.2d at 1285-86) (noting that although plaintiff in that case "may not assert equitable estoppel as a separate claim, this does not prohibit her from asserting principles of equitable estoppel as a theory for recovery of benefits.").

interest rate. However, the preceding language in that section is potentially problematic:

> The amount payable for the first year hereunder shall be an amount that will fully amortize the balance in Participant's Deferred Benefit Account, as of the Participant's Benefit Determination Date, over the fifteen (15) year period, based on assumed interest earnings using the Interest Earnings Rate . . . as of said Benefit Determination Date.

(Id.) Here again, benefits are calculated "based on assumed interest earnings using the Interest Earnings Rate." If that clause modifies the full amortization of the balance (i.e., during the payment period), then the entire section of the Plan is consistent, and the clear language in regards to payment using the Interest Earnings Rate should control. However, the clause at issue could have another meaning. If that clause modifies "the balance in Participant's Deferred Benefit Account, as of the Participant's Benefit Determination Date," then §5.5 directly conflicts with §5.4(a). Both parties agree that §5.4(a) compares the guaranteed minimum rate and the variable rate at least at the time of retirement (or the Benefit Determination Date). Under that interpretation, if §5.5 did not properly account for the minimum interest rate when determining the account balance on the "Benefit Determination Date," then

the lack of an option for a minimum interest rate during the payment period is not enlightening.[2]

Finding that §5.5 is ambiguous is only a first step. If §5.4 clearly directs the administrator to only consider the minimum interest rate only at the Benefit Determination Date, then §5.5's ambiguity is unimportant. The relevant language of §5.4(a) states that:

> a benefit shall be payable to such Participant ("Retirement Benefit") equal to the greater of: (i) the total amount of such Participant's Deferred Benefit Account . . . as of his Benefit Determination Date, including interest at the Interest Earnings Rate, through such Benefit Determination Date; or (ii) the amount determined pursuant to Schedule B attached hereto and made a part hereof. . . .

(Pl.'s Mot. for Summ. J., Ex. A, §5.4(a)). Schedule B, in turn, is titled "Summary of Guaranteed Minimum Annual Retirement Benefits." (Pl.'s Mot. for Summ. J., Ex. D). It lists three amounts: (1) an "annual retirement benefit at age 65 for 15 years"; (2) a "total retirement benefit"; and (3) an "account balance at retirement." (Id.) The total retirement benefit and annual retirement benefit are calculated on Schedule B using the minimum interest rate of 11%. The Defendant argues that the only "apples-to-

---

[2] The Court is aware of the general preference to avoid interpretations that render contractual language superfluous. See Westport Insurance Corp. v. Tuskegee Newspapers, Inc., 402 F.3d 1161, 1165-66 (11th Cir. 2005) (noting Alabama law's strong disfavor of rendering terms superfluous). Again, however, the task is not to determine the correct interpretation, but only decide if there is more than one reasonable interpretation.

apples" reading of §5.4(a) is to compare the total of the account at retirement using the Interest Earnings Rate (the figure described in §5.4(a)(i)) with the "account balance at retirement" figure from Schedule B. It would be illogical, the Defendant argues, to compare the account balance from §5.4(a)(i) with the total payment (because the account accumulates more interest even after contributions cease) or a monthly payment -- which is infinitesimal compared to the account balance at retirement using any interest rate. Furthermore, the Defendant argues, §5.4 only deals with the determination of benefits and contains no direction about the actual payment of the benefits (dealt with in §5.5).

The Defendant's arguments are sensible. As noted, however, the Court need not determine which is the correct interpretation, only if there is more than one reasonable interpretation. There are still a few basic questions clouding the picture. For instance, why is Schedule B (incorporated without any express limitation by §5.4(a)) titled "A Summary of Guaranteed Minimum Annual Retirement Benefits" if its only purpose is to state the minimum account balance at retirement? Why would §5.4(a) describe a figure as "Retirement Benefit," and Schedule B describe the Defendant's preferred figure as an "Account Balance"? This is particularly confusing when the other two figures -- the figures the Defendant urge the Court to totally ignore -- both incorporate the term "Retirement Benefit." Why should Schedule B not be

incorporated fully, if there was no express reservation of its terms within the contract? In the final analysis, it is not unreasonable to assume that the Plan contemplates that Schedule B be incorporated fully. It has neither an express limitation in §5.4(a) nor any disclaimer that it is a mere estimate. Rather, it proclaims that the amounts listed are "Guaranteed Minimum Annual Retirement Benefits." Naturally, evidence of this confusion and ambiguity is found in the historical actions of the Defendant itself. Cf. Burger v. Life Insurance Company of North America, 103 F. Supp. 2d 1344, 1349 (N.D. Ga. 2000) (ERISA claim brought under equitable estoppel failed despite previous overpayment of benefits). The Defendant "misinterpreted" the Plan for years, resulting in what it deemed to be overpayments to the Plaintiff for nearly five years. Further, it repeatedly sent "Projected Benefits Statements" that projected benefits with a Moody's plus 3 rate, but also clearly stated a "minimum retirement benefit" using the 11% rate. (Pl.'s Mot. for Summ. J., Ex. YY).

Because the Plan was ambiguous, "the application of equitable estoppel will not result in an extension or enlargement of the benefits available under the Plan." Kane, 893 F.2d at 1285 n.3. Generally, an application of estoppel may not extend or enlarge benefits. This is a low bar to clear for plaintiffs where, as here, the Defendant made representations that "amounted to an interpretation of an ambiguous provision of the Plan, not an extension of coverage beyond that specified in the Plan." Id.

The Defendant argues that the equitable estoppel claim must fail because the Plaintiff did not rely on any representations that there was a minimum interest rate. Glass v. United of Omaha Life Insurance Co., 33 F.3d 1341, 1345 (11th Cir. 1994). The Defendant's first argument against reliance is that the Plaintiff was not entitled to rely on any statements inconsistent with the Plan's language. However, as discussed above, both parties for a prolonged period of time interpreted the Plan to provide a minimum interest rate. And any statements considering an ambiguous contract term are not attempted modifications of the contract, but interpretations of the contract. Wright v. Aetna Life Insurance Co., 110 F.3d 762, 764 (11th Cir. 1997). As long as the provisions at issue are ambiguous, it is reasonable for the employee to rely on his or her employer's statements. See Kane, 893 F.2d at 1285-86 (reasonable reliance when on multiple occasions, the Defendant, "acting by and through its duly authorized representative, assured [the Plaintiff of benefits]."). For the remainder of this issue, one document, titled "Illustrations Depicting Projected Retirement Benefits At Various Retirement Ages" is most relevant. (Pl.'s Mot. for Summ. J., Ex. F). The Defendant does not dispute that this document used a minimum interest earnings rate throughout the payment period but does argue that reliance was not reasonable on this document because it was purported to be only a set of "illustrations" and projections. (Def.'s Br. in Opp'n to Pl.'s Mot. for Summ. J., at 20-22). Although the parties agree

that the figures were only projections, those projections nonetheless presented parallel amounts -- one with a variable interest rate and another with a "guaranteed minimum interest earnings rate." (Id.) The Plaintiff was entitled to rely on the assertion that he would enjoy a minimum interest rate during his payment period. Exhibit F is also noteworthy because the Defendant issued those projections before the Plaintiff enrolled in the Plan on August 23, 1985. (Waschak Decl. ¶¶ 4-6; see also Def.'s Resp. to Statement of Undisputed Material Facts in Supp. of Pl.'s Mot. for Summ. J., ¶ 4). As a result of this undisputed evidence, the Defendant's argument that the Plaintiff could not have relied on any representations that the Defendant issued after the Plaintiff enrolled in the irrevocable plan is unavailing. Further, the Defendant cites no authority as to how the Plaintiff was not entitled to rely on the minimum interest payments after he (1) already received the alleged overpayments for nearly five years and (2) received clear and repeated representations that he would receive a "minimum retirement benefit" throughout his payment period. (See, e.g., Pl.'s Mot. for Summ. J., Ex. W, Y, Z, YY).

It is not necessary to determine whether the Plan mandates that the Defendant's historical interpretations should bind the Defendant in its future application of the Plan. Section 9.1 states that the "Plan Administrator shall have the exclusive discretionary authority to construe and to interpret the Plan, to decide all questions of

eligibility for benefits and to determine the amount of such benefits, and its decisions on such matters shall be final and conclusive on all parties." (Pl.'s Mot. for Summ. J., Ex. A, § 9.1). The Defendant does not dispute that it previously represented that there was a guaranteed minimum interest rate during the benefit period. Because the Plaintiff's claim satisfies the elements for equitable estoppel, the Court will not discuss the preclusive impact of § 9.1.

## IV. Conclusion

For the reasons set forth above, the Plaintiff's Motion for Summary Judgment [Doc. 22] is GRANTED and the Defendant's Cross Motion for Summary Judgment [Doc. 23] is DENIED.

SO ORDERED, this 13 day of January, 2009.

/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge